## Case No. 4,089.

### DRISKILL v. PARRISH.

[3 McLean, 631;[1] 5 West. Law J. 25.]

Circuit Court, D. Ohio. July Term, 1845.

SLAVERY — ACTION FOR HINDERING ARREST OF FUGITIVE — AUTHORITY OF AGENT TO ARREST — PENALTY—WHAT CONSTITUTES THE OFFENCE.

1. Where a written power of attorney is given to an agent, authorising him to arrest a fugitive from labor, and he acts under such power in attempting to make the arrest, the power must be produced, or its contents proved, in an action against an individual for hindering the arrest.

[Cited in Giltner v. Gorham, Case No. 5,-453.]

2. No one incurs the penalty under the act of congress [1 Stat. 302] for hindering or obstructing the arrest, who does not act "knowingly." He must have notice that the colored persons are fugitives from labor, and that the agent has authority to arrest them.

[Cited in Giltner v. Gorham, Case No. 5,-453; U. S. v. Weld, Id. 16,660.]

3. The principle is the same, whether the arrest be made with the view of removing the fugitives out of the state, or taking them before a judicial officer.

4. The power of attorney is in the nature of process, and should be shown, if demanded.

5. No one incurs the penalty who hinders an arrest by persons who have no authority to make it.

6. To obstruct the arrest is an offence, and the guilt of the party charged should be clearly established.

7. There can be but one penalty for the same act, in hindering an arrest, of one or many fugitives from labor. And so of harboring one or many at the same time.

[U. S. v. Grant, 55 Fed. 415.]

8. The penalty is not given as a compensation to the master, but as a punishment for the offence.

9. To harbor or conceal under the statute, there must be a manifest design to elude the claim of the master.

10. An open and fair action, with an intention to procure a fair legal hearing for the fugitive, is no violation of the act.

[This was an action by Peter Driskell against Francis D. Parish for hindering and obstructing the arrest of a fugitive slave.]

Mr. Stanbury, for plaintiff.
Lane & Chase, for defendant.

OPINION OF THE COURT. This action is brought under the fourth section of the act of congress of 1793, respecting fugitives from labor. The section provides, "that any person who shall knowingly and willingly obstruct or hinder such claimant, his agent or attorney, in so seizing or arresting such fugitive from labor," &c., "or shall harbor or conceal such person after notice that he or she was a fugitive from labor, as aforesaid, shall, for either of the said offences, forfeit and pay the sum of five hundred dollars." The declaration contains four counts; two for hindering and obstructing the arrest of Jane Garretson, a colored woman, and her son, slaves of the plaintiff, who were fugitives from labor; and two counts for harboring and concealing them. The defendant pleaded not guilty.

Col. Mitchell, a witness, states that he called with Driskill, son of the plaintiff, at defendant's house in Sandusky city, and inquired of him whether a colored woman named Jane Garretson was there. The defendant answered she was; the witness then asked if he could see her; defendant replied, "Yes, if she wishes it." Witness said, "She was a slave of Peter Driskill, had escaped from her master, and that he was authorised to take her to Kentucky." The defendant went into the house and soon returned, the woman following him. She recognized the witness, spoke to him, and was approaching him, when the defendant interposed his hand, though he did not touch her. She called young Driskill "Master Jackson." Some conversation was had respecting the death of her young mistress, who had died, as she said, before she left Kentucky. The boy was then asked for, and he was brought out. He also knew the witness and Driskill, and by his approach seemed to wish to shake hands with the witness, when the defendant interposed his hand and said, it was not necessary to shake hands. The witness then claimed the right to arrest these two persons, to take them before some judicial officer, and show the right of the plaintiff to their services. The defendant asked by what authority; the witness replied by virtue of a power of attorney from the master, and laid his hand upon the paper; the defendant objected to the authority and said, that nothing less than judicial authority was sufficient or would satisfy him. He then by words or signs directed the woman and her son to return into the house, which they did, and he followed them, shutting the door after him. The witness states that he lives near to the farm of the

[1] [Reported by Hon. John McLean, Circuit Justice.]

plaintiff in Kentucky, and is well acquainted with Jane and her son, and that they are the slaves of the plaintiff. That they absconded from his service some months before, with other colored persons owned by him. Driskill being sworn, with less minuteness, relates the leading facts as stated by Col. Mitchell. He differs from Mitchell in saying that the defendant pushed Jane and her son into the house. Sarah Gustin was an inmate of the defendant's house. She stood in the passage and heard a part of the conversation. She heard the defendant say to Col. Mitchell, that he could not take the colored persons unless he had lawful authority. Parol evidence was then offered to prove the authority of Col. Mitchell to arrest the fugitives, as agent of the plaintiff. This was objected to by the defendant, on the ground that the authority was in writing, and consequently could not be proved by parol.

This is an important question. Mitchell did not claim to act in his own right but as the agent of the plaintiff, and he referred to a written power of attorney as his authority. The defendant can take no exception to the power, from the fact that it was not shown to him. He declined an examination of it, alleging that judicial authority was required to make the arrest. In this he was mistaken; and his error, in this respect, constitutes no excuse. The question is not strictly whether a parol authority may not authorise an arrest of a fugitive from labor, but whether a written authority may be abandoned, and a parol one substituted. We are aware that there are many things in writing which may be proved by parol, without proof of the loss of the writing. But does this power of attorney come within this rule? In the case of Johnson v. Tompkins [Case No. 7,416], it is said, "If the person arrested is not a servant or slave, or the person making the arrest has not the authority of the master for so doing, he is in either case liable for the illegal arrest." And Mr. Justice Washington, in Hill v. Low [Case No. 6,494], says, "that it was sufficient to bring the defendant within the provisions of the law, if having notice either by the verbal declarations of those who had the fugitive in custody, or were attempting to seize him; or by circumstances brought home to the defendant, that the person arrested was a fugitive, or was arrested as such." The object of the arrest in the present case was avowed to be, to take the fugitives before a judicial officer. But the same principle applies where the arrest is made for the purpose of taking the fugitive by force out of the state, and without judicial sanction. This the claimant or his agent may lawfully do, under the constitution of the United States, according to the doctrine laid down by a majority of the judges in the case of Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 539. This then, as claimed, is no ordinary power. It

sweeps aside state laws and state sovereignty, and enables an individual who claims to act as agent to take any person, white or colored, as a fugitive from labor, without any exhibition of his personal authority, or of the claims of the master.

The constitution of the Union, and the laws made in pursuance of it, are declared to be paramount to the laws or constitution of a state. But from this it does not follow that the remedy under the federal power, against fugitives from labor, being in the hands of the master, may be exercised without restriction and without regard to the rights of others. The common law doctrine of recaption is adverted to as authorising this remedy, independently of the constitution and the act of congress. The right of recaption was limited to the sovereignty in which the right was sanctioned. Neither the laws of nations nor the common law authorise the master to recapture his slave beyond the jurisdiction in which slavery is sanctioned. The constitution and the act of congress give the remedy in this case. It may be admitted as between the master, or his agent, and the fugitive, the inquiry would be, whether the master had a legal claim to the services of the fugitive. And if this claim were not sustained, the person making the arrest would be responsible in damages. The authorities above cited, from Baldwin's and Washington's Reports, seem to place the person who shall obstruct or hinder the arrest on the same footing, in this respect, as the fugitive. But we cannot assent to this view. The fugitive stands upon the fact of service, and if this be against him, by whatever means he may be returned to his master, he could recover no damages. But the defendant cannot be subjected to the penalty of five hundred dollars, under the act, unless he "knowingly and willingly" obstructed or hindered the arrest. This is called in the act an "offence," and had not the statute given a civil action for the penalty, it might have been recovered by an indictment. Now, can an individual commit this offence unless he have reasonable knowledge, not only that the persons claimed are fugitives from labor, but that the person making the arrest has authority to make it? The character of the fugitive may be made known by himself, or by those who arrest him. Or the knowledge of the defendant may be inferred from circumstances. But the authority of the agent must be made known. If he act without authority, no person who "hinders" the arrest incurs the penalty. It is no answer to this to say, that such person acts on his own responsibility and must meet the consequences. He must act "knowingly," which presupposes a knowledge of such facts as authorise an arrest. If he act in ignorance of these facts, he does not act "knowingly."

Bail, it is said, may arrest their principal

wherever he shall be found. This is admitted, because the principal as a condition of the recognisance, is delivered to the custody of his bail. But they must have a bail piece as the evidence of their authority to arrest him. "An officer acting out of his precinct is bound to show his warrant." Lord Kenyon observed, "that he did not think a person is bound to take it for granted, that another who says he has a warrant against him, without producing it, speaks the truth." "It is, therefore, very important in all cases where the arrest is made by virtue of a warrant, that the warrant should at least, if demanded, be produced, to leave a delinquent no excuse for resistance." 1 Chit. Cr. Law, 51. "If a warrant be defective, or the officer exceed his authority in executing it, if killed, it is only manslaughter; and any third person may lawfully interfere to prevent an arrest under it." 1 East, P. C. 310; Leach, 206; 1 Barn. & C. 291. The agent in this case referred to his power of attorney and was ready to produce it, but its production was waived by an objection to its sufficiency. Having acted under this power, must it not be produced in evidence? It is in the nature of process. In fact it was the warrant of the agent. It having been given in writing, precludes the presumption that it was given by parol. Whatever conversation may have taken place between the agent and his principal on the subject of his agency, at length and as the last act, in accordance with legal advice, the power of attorney was executed. Now this power must speak for itself. It is as important as a warrant can be to an officer, and it would seem that in this action, which is brought to subject the defendant to a penalty, it must be produced, or its contents proved, after establishing its loss. This imposes no hardship on the master or his agent. It would be required in claiming an estray horse, found in the possession of any one. The power may be defective. It may authorise the arrest on conditions which did not happen. Viewing then this power as process, and considering that the same principle must govern, whether the arrest be with the object to take the fugitive before a judicial officer to establish the right to his services, or to take him out of the state, we consider the power to be of high importance. The consequence resulting from its exercise is important to the fugitive, to the claimant, and to the state from whence he is taken. And as a written power of attorney would impose a form to the proceeding, and tend to prevent abuse. we are strongly inclined to say, it is necessary to authorise an agent to make the arrest. But this point is not necessarily involved in the case, and we do not decide it. We think that the power in question. under the circumstances, must be produced or its contents proved. Some evidence was given to prove the loss of the

power; but nothing was shown from which its loss could be inferred.

The evidence of the plaintiff being closed, a motion for a non-suit was made, and the ground that the declaration charged the defendant with having "harbored and concealed" the fugitives, and not in the language of the act, with having "harbored or concealed them." It is alleged that these words are not synonymous, and that they are not so used in the statute. And that both allegations must be proved. If the import of these words were different, as contended, still there is no ground for a non-suit. In the act, they are used in the disjunctive, so that, although they are alleged conjunctively in the declaration, the proof of either would sustain the action. In slander, it is now allowed to be sufficient if the plaintiff prove some material part of the words laid; and, if his count contain several additional words, he is entitled to a verdict on proving some of them. Compagnon v. Martin, 2 W. Bl. 790. If a plea in trespass aver two matters, either of which is a good justification, though both be put in issue by the replication, proof of one is sufficient. Spilsbury v. Micklethwaite, 1 Taunt. 146. So, where a declaration for a false return to a fi. fa. against the goods of two, averred that both had goods, it was held sufficient to prove that one had goods within the bailiwick. Jones v. Clayton, 4 Maule & S. 349. So in an indictment, only so much need be proved as charges the defendant with a subsequent crime. Rex v. Hunt, 2 Camp. 583; Rex v. Williams, Id. 646; 2 East, P. C. 515.

Defendant's Evidence: Mr. Barbour—was present at the trial in the court house, at Sandusky city, and heard defendant relate the occurrences before his door, which were assented to by Col. Mitchell as correct, with the exception of the advance of the boy to shake hands with him, which was omitted by defendant. This statement, thus assented to by Col. Mitchell as correct, did not contain any demand by him, in relation to the arrest. He admitted that defendant said he was a law abiding man, and wanted only a fair and legal trial. And Col. Mitchell said that he did not complain of the defendant's acts, for that he had treated him as a gentleman. To this the defendant replied, that Col. Mitchell had acted like a gentleman. Mr. Beecher—who was present at the court house on the same occasion, and heard the statements made by Col. Mitchell and the defendant, corroborates the relation made by Mr. Barbour; in some parts, stating the facts more minutely than he did. Mr. Henry—heard only a part of the conversation at the court house. So far as he goes, he corroborates the statements of Barbour and Beecher, except, he has no recollection of hearing any thing said about a fair trial. Col. Mitchell—being again called, says, he cannot recollect distinctly the words, at the various conversations had at the court house.

He admits that he assented to the facts stated, as related by Mr. Barbour and Mr. Beecher, except the remark of the defendant, "that he was a law abiding man. and wanted only a fair trial;" which remark, he says, was not made before the defendant's door, but after that interview, and at a different place. He repeats, that, at the first interview with the defendant, before his door, and in the presence of the colored persons, he claimed the right to arrest them as fugitives.

The above, gentlemen of the jury, is a concise, but substantial statement of the evidence in the case. As the court have excluded parol proof of the authority of the agent, he having acted under a written power, the plaintiff does not rely upon the two first counts for "obstructing and hindering" an arrest. He relies upon the other two counts in his declaration, which charge the defendant with having "concealed and harbored the fugitives." The action is founded upon the statute, which subjects any one "who shall conceal or harbor" a fugitive from labor, after notice that he is such fugitive, to a penalty of five hundred dollars. The language is in the singular number, and as the declaration charges the defendant with having harbored two fugitives, which the evidence has conduced to prove, the plaintiff claims the penalty of five hundred dollars in each case. This construction of the act, the court think, is not sustainable. There can be but one penalty for concealing or harboring at the same time, whether there be one or many fugitives. The act is a penal one, and was not framed with the view of giving a compensation to the master for the injury done. In the same section which gives to the master this action for the penalty, it is added, "saving, moreover, to the person claiming such labor or service, his right of action for or on account of the said injuries, or either of them." There can be no doubt, that the same individual may be convicted of "hindering" an arrest of the fugitive, and also of "harboring" him, which will subject him to two penalties, the acts being distinct, and at different times. But whether the "hindering" of the arrest, or "harboring," be of one or many fugitives, at the same time, the penalty is the same. It is the act of "concealing" the fugitive. or for "obstructing" his arrest, that is punished. If this penalty were to be enforced by indictment, as might have been provided, the act must have received the same construction. An individual who counterfeits the coin of the United States, is liable to be punished, whether he counterfeit one piece or many pieces. So for stealing one or many articles of property. The punishment. in some cases, is inflicted under the exercise of a limited discretion of the court; but where the offence is stealing one or many letters, by a post master, from the mail, the punishment cannot be less than ten years confinement in the penitentiary. Where the punishment is fixed, the court can

exercise no discretion. If the defendant be guilty in this case, neither the court nor jury can exercise any discretion in regard to the penalty.

The charge against the defendant is, that he "harbored and concealed" the fugitives in question, after notice that they were fugitives. That "notice," in this relation, means "knowledge," has been decided by the supreme court. And, from the evidence, it would seem that the defendant was informed by the agent, who held a power of attorney from the master, that the colored persons were fugitives from service. It is also inferrible from the conversation of Jane with the witness, in the presence of the defendant. Did the defendant harbor or conceal the fugitives? To answer this inquiry, we must understand what is the true import of the words, "harboring or concealing." By Worcester. the word "harbor" is defined, "To entertain; to shelter; to rescue; to receive clandestinely and without lawful authority." By Webster. "To shelter; to rescue; to secrete; as to harbor a thief." Worcester defines the word "conceal," "To hide; to keep secret; to secrete; to cover; to disguise." And Webster, "To hide; to withdraw from observation; to cover or keep from sight."

It is insisted, that any one who shall permit a fugitive from labor, after notice that he is such fugitive, to enter his house, and remain for any time, is liable, under the statute, for harboring or concealing him; and that the intention with which the act is done is of no importance, as the act constitutes the offence. This position as laid down is unsustainable. The intention with which an act is done, gives the character of guilt or innocence to the act. Homicide may be committed innocently. If, in the performance of a lawful act, and without any intention to do evil to any one, by shooting at a mark or otherwise, a person should be killed, no crime is perpetrated. An officer arrests a fugitive from labor for debt, or a breach of the peace, and retains in his custody such fugitive, the penalty is not incurred. So, if the fugitive be stricken down by sudden disease, and a person, through motives of humanity, shall take him to his house and endeavor to alleviate his distress. no offence is committed. So if an individual shall seize a fugitive from labor, without authority, with the view of returning him to his master, and, in the act of doing so, the fugitive should escape, it would hardly be contended that, for such an act. the master can claim the penalty. And if an individual employ a fugitive from labor, with the view of detaining him until notice can be given to his master, and he gives the notice, but the fugitive escapes, is the individual guilty of "harboring or concealing" him under the statute? These cases are put, because the counsel for the plaintiff will not controvert them; and

they show, that the intention must enter into and give a character to the act of harboring or concealing a fugitive, the same as in every other act of good or evil, of innocence or guilt. This is the great criterion of human judgment, and, as we believe, will be the criterion of man's final destiny.

The words, "harbor" and "conceal," were not used in the statute as constituting two distinct offences, but as descriptive of the same offence. All our statutes abound with unnecessary verbiage. It would be impossible for an individual to conceal a fugitive who might not be charged with harboring him, in the sense of the statute. In 1 Chit. Gen. Pr. 567, cases are referred to where it has been decided, that the employment of an apprentice after notice, is a harboring of him, which gives an action to the master for his wages. The master is entitled to his labor, and, consequently, when he labors for another, who has notice that he is an apprentice, the employer is bound, on equitable principles, to pay the master. But the foundation of the action under consideration is an "offence," so denominated in the act, and for which a penalty is inflicted. To harbor or conceal a fugitive from labor, within the meaning of the statute, it must be done with the view to elude the claim of the master. If a shelter be afforded to the fugitive for an hour, a day, or a week, when there is manifestly no design to conceal him from the pursuit of the master or his agent, or in any way to defeat the legal right of the master to his service, there is no violation of the statute. The intention is ascertained from the nature and circumstances of the acts done. From these, no unbiased mind. can fail to form a just opinion. Has the conduct of the defendant been fair, open, and such as becomes an individual who respects the laws of his country? Has it been consistent with a desire to give effect to the law, by an impartial inquiry? If these can be answered in the affirmative, he is not guilty. On the contrary, if he harbored the fugitives after he had notice that they were fugitives from labor, so as to defeat the claim of the master, or in a way that was manifestly designed to defeat it, he has incurred the penalty. Gentlemen, it is not our province to consider abstract principles in regard to slavery. We deal with legal rights and established law. From these we cannot depart, without a violation of our duty.

(The jury retired, and after having been out several hours, returned into court and declared they could not agree. The court discharged them, and continued the cause.)

[NOTE. There were two subsequent trials of this case, one at November term, 1847, and one at November term, 1849, the latter resulting in a verdict for plaintiff in the sum of $500. See Cases Nos. 4,087 and 4,088. Afterwards the case was heard on motion by defendant to retax the costs. See Id. 4,075 and 4,076.]